O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SANTA BARBARA, JOSHUA ELIZALDE, and JOHN DOES 1–10,<br><br>Defendants. | Case No.: 2:24-cv-04334-MEMF (SKx)<br><br>**ORDER GRANTING DEFENDANT COUNTY OF SANTA BARBARA'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 67]** |

Before this Court is the Motion for Partial Summary Judgment filed by Defendant County of Santa Barbara. Dkt. No. 67. The County moves for summary judgment on Plaintiff's first claim, for violations of 42 U.S.C. § 1983 on the basis of the County's official policy, practice, or custom. For the reasons below, this Court GRANTS the Motion.

/ / /

/ / /

/ / /

/ / /

1

## I. Factual & Procedural Background

This action arises from Jane Doe's allegations that former Santa Barbara Deputy Sheriff Joshua Elizalde sexually assaulted, harassed, and battered Doe while Elizalde was on duty. The County of Santa Barbara ("the County") moves for partial summary judgment solely on Plaintiff's first claim. This is a *Monell* claim for violations of 42 U.S.C. § 1983 on the basis of the County's official policy, practice, or custom.

On May 5, 2024, Doe filed her initial Complaint in this Court; on August 9, 2024, she amended her pleadings by filing the operative First Amended Complaint. *See* Dkt. No. 1; Dkt. No. 17 ("1AC"). The named defendants are Elizalde and the County (collectively, "Defendants"). That complaint alleges eleven causes of action: (1) against the County for violations of 42 U.S.C. § 1983 on the basis of the County's official policy, practice, or custom; (2) against Elizalde for violations of 42 U.S.C. § 1983; (3) against all Defendants for a violation of the Bane Act, Cal. Civ. Code § 52.1; (4) against all defendants for a violation of the Ralph Act, Cal. Civ. Code § 51.7; (5) against all Defendants for a violation of the Unruh Act, Cal. Civ. Code § 51[1]; (6) against Elizalde for gender violence, Cal. Civ. Code § 52.4; (7) against Elizalde for sexual harassment, Cal. Civ. Code § 51.9[2]; (8) against all Defendants for assault; (9) against all Defendants for sexual battery; (10) against all Defendants for false imprisonment; and (11) against all Defendants for the intentional infliction of emotional distress. Compl. at 1–2.

On October 2, 2025, the County filed the instant Motion.[3] Dkt. No. 67. Pursuant to this Court's Civil Standing Order, the parties filed a joint memorandum of points and authorities. Dkt. No. 67-1 ("MPA"). The parties also filed a joint Statement of Uncontroverted Facts and Genuine Disputes in support of the MPA. Dkt. No. 70 ("SUF").

---

[1] The parties have jointly stipulated a voluntary dismissal of the Unruh Act claims. Dkt. No. 61.

[2] The parties have jointly stipulated a voluntary dismissal of the sexual harassment claim. Dkt. No. 163.

[3] "Elizalde does not oppose the Motion for Partial Summary Judgment." MPA at 2.

2

The Court held a hearing on the Motion on November 13, 2025. At the hearing, the County submitted on the tentative order. The Court took the Motion under submission at the conclusion of the hearing.

## II. Applicable Law

### A. Motions for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

### B. *Monell* Claims Under § 1983

A plaintiff in a Section 1983 claim may recover from any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, [the plaintiff] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

"*Respondeat superior* or vicarious liability will not attach under § 1983*." City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Instead, a municipality may be held liable under Section 1983 only where an "action pursuant to official municipal policy of some nature causes a

4

constitutional tort." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021) (*Gordon II*) (explaining the elements of *Monell* liability, one of which is that a *municipality* had a policy). To impose liability on the County under Section 1983, Doe must prove: (1) Doe possessed a constitutional right that was violated; (2) the County had a policy; (3) the policy amounts to deliberate indifference to the constitutional right; and (4) the policy is the moving force behind the constitutional violation. *See Gordon II*, 6 F.4th at 973.

A plaintiff can establish that such a policy or custom occurred by showing "(1) an official policy, (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). To implicate *Monell*, an unofficial custom or practice "must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

### III. Findings of Fact[4]

The Court finds makes the following findings of fact for purposes of this Motion. Given that the County's motion was limited and Elizalde did not join the motion, the Court declines to find that these material facts are established for trial under Federal Rules of Civil Procedure 56(a) and 56(g).

#### A. Elizalde's Hiring and Training

On January 2, 2018, Elizalde began working with the Santa Barbara County Sheriff's Office ("SBSO"). SUF ¶ 1. He was a Deputy Sheriff Trainee at the time. *Id.*

Elizalde received instruction and training in connection to his service as an SBSO officer. Upon beginning his employment with SBSO, he acknowledged that he had been instructed to adhere to the rules and guidelines of the SBSO Policy Manual. *Id.* ¶ 5. He also acknowledged receipt of SBSO's Discriminatory Harassment Policy and the County's Anti-Harassment Policy. *Id.* ¶ 6. As

---

[4] The facts set forth below are taken from the parties' Joint Statement of Uncontroverted Facts. *See generally* SUF. To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

part of his onboarding, from January to June 2018, Elizalde attended a twenty-two-week Basic Law Enforcement Academy, designed to satisfy all California Peace Officer Standards and Training requirements. *Id.* ¶ 2. Elizalde also completed SBSO's Field Training Program in October 2018. He completed County-mandated Anti-Harassment Training on November 29, 2019, and December 23, 2021. *Id.* ¶ 7. And he received training on how to respond to calls involving allegations of sexual assault. *Id.* ¶ 9.

Inside of SBSO patrol units like the one that Elizalde drove, a Mobile Digital Computer ("MDC") is mounted. *Id.* ¶ 118. SBSO officers use the MDC to log in at the beginning of patrol shifts. *Id.* When an MDC experiences connection issues, the GPS tracking of the patrol unit is interrupted. *Id.* ¶ 119. When that happens, the computer-aided dispatch ("CAD") Unit Activity Log shows the unit's last known location unless a dispatcher enters overriding location information, or until the MDC location is re-established. *Id.* SBSO also uses a system called VisiNet to send data to mobile units related to service calls. *Id.* ¶ 120. VisiNet and CAD interface to dispatch calls for service. *Id.* As with the MDCs, VisiNet can track deputy locations; when it is turned off or connectivity is lost, it displays a patrol unit's last known location. *Id.* ¶ 121. If VisiNet is turned off, it displays the unit's last known location until connection is reestablished. *See id.* ¶¶ 121-22.

### B. Elizalde's Interactions with Doe

On December 30, 2022, Doe reported a possible trespassing at her residence. *Id.* ¶ 13. Elizalde was dispatched to Doe's address along with two other SBSO officers. *Id.* ¶ 14. They found no evidence of a crime at Doe's address on December 30, 2022. *Id.* ¶ 15. Doe explained to Elizalde that she was in a dispute with her landlord, and Doe identified the suspected trespasser as a woman who worked for Doe's landlord. *Id.* ¶ 16. At that time, Doe informed Elizalde that she had been a victim of domestic violence, that she had a restraining order against an individual who lived in the County, and that an SBSO detective—Christopher Heidt—had previously investigated Doe's allegations of sexual assault and domestic violence. *Id.* ¶ 17–19. That report was saved in the SBSO Automated Report-Writing System ("ARS"). *Id.* ¶ 138. At the end of Elizalde and Doe's discussion, Elizalde gave Doe his SBSO business card. *Id.* ¶ 20. Later that day, Elizalde's body number was entered to access the original report in Doe's May 2022 domestic violence case. *Id.* ¶ 21.

6

Beginning on January 20, 2023, Doe and Elizalde began corresponding via email. *Id.* ¶ 25. Doe reached out to Elizalde to ask for a copy of the trespassing incident report. *Id.* In response, Elizalde provided Doe an SBSO patrol phone number at which she could reach him. *Id.* at ¶¶ 25-26. The SBSO patrol phones are only possessed by SBSO deputies, and different deputies possess each of the phones depending on who is on duty. *Id.* ¶ 28. On January 25, 2023, Elizalde visited Doe's home to follow up regarding the initial December 30, 2022, call for service. *Id.* at ¶ 30-32. At that time, Elizalde gave Doe a phone number with which she could reach him on his personal phone. *Id.* ¶ 32. From January 25 to March 3, 2023, Doe and Elizalde communicated through Elizalde's personal phone number. *Id.* ¶ 35.

On January 27, 2023, Doe drove to an SBSO station to meet with Elizalde. *Id.* ¶ 37. Doe's 1AC alleges that, at the SBSO station, Elizalde "started rubbing [Doe's] thigh with his hand," "put his hand on [Doe's] neck by her jaw," and "slide his hand around to the side of [Doe's] neck, caressing her and moving her hair." *Id.* ¶ 40; 1AC ¶¶ 73–76. Per Doe's operative Complaint, she did not consent to that physical contact. SUF ¶ 76. During this time, per SBSO records, Elizalde's patrol unit's Mobile Data Computer ("MDC") experienced a connection failure; Elizalde had turned off the MDC in his patrol unit. *Id.* ¶ 39.

On January 30, 2023, Elizalde requested an SBSO case number be assigned for a report preparation about Doe's landlord-tenant incident. *Id.* ¶ 44. Elizalde's supervisor, SBSO Sergeant Seth Woodill, asked Elizalde why he had pulled a case number for a civil issue. *Id.* ¶ 45. In response, Elizalde communicated that he was going to document the landlord-tenant incident at Doe's request. *Id.* at ¶ 45. Later that night, Elizalde met Doe at her house to have dinner together. *Id.* ¶ 47. During that night, per SBSO records, Elizalde's MDC experienced an hourlong connection failure; again, Elizalde had turned off the MDC. *Id.* ¶¶ 47-48.

Later that night, Doe and Elizalde met again, at an address Elizalde gave her. *Id.* ¶¶ 53-54. Per Doe's operative Complaint, on that night, Elizalde instructed Doe to get into his patrol unit, where he began holding her shoulder and the back of her neck. *Id.* ¶ 55. During that meeting, Elizalde wanted to be in his vehicle instead of Doe's, so that if a call came up or if he saw a

colleague approaching their location, Doe could exit the patrol unit and he could leave. *Id.* ¶ 57. Elizalde did not turn off the MDC in his patrol unit during this interaction with Doe. *Id.* ¶ 58.

On January 31, 2023, Doe and Elizalde planned to meet again. *Id.* ¶ 60-61. Again, per SBSO records, Elizalde's MDC experienced a connection failure. *Id.* ¶ 62.

On February 1, 2023, Doe and Elizalde met at an SBSU station in Buellton. *Id.* ¶¶ 64-67. Per Doe's operative Complaint, while Doe and Elizalde were inside the Buellton station, Elizalde directed Doe to sit down, put his arms around Doe, moved Doe from her chair and had her sit on his lap, started to rub her thigh, and attempted to kiss her while holding her on his lap. *Id.* ¶ 69.

On February 8, 2023, Doe's home security video shows Elizalde arriving at Doe's home at 12:30 AM and departing at 1:30 AM. *Id.* ¶ 85. At 12:21 AM, SBSO records showed a connection failure of Elizalde's patrol unit MDC; the connection re-established at 1:41 AM. *Id.* ¶ 86.

On February 13, 2023, Doe's home security video shows Elizalde arriving at Doe's residence at 9:19 PM and departing at 10:51 PM. *Id.* ¶ 97. Doe alleges that, during this time, Elizalde sat with Doe on her couch and attempted to kiss and hold her. *Id.* ¶ 98. At 9:07 PM, SBSO records show a connection failure of Elizalde's patrol unit MDC, where his location appeared to be an SBSO station. *Id.* ¶ 96. At 11:05 PM, Elizalde's patrol unit MDC reconnected. *Id.* ¶ 99. This was the last time that Elizalde and Doe met in person. *Id.* ¶ 100.

### C. Elizalde's Investigation and Termination

On March 7, 2023, Doe contacted Detective Heidt—the SBSO officer who had investigated her initial domestic violence complaint—to report Elizalde's conduct. *Id.* ¶ 108. On that day, Heidt informed his chain of command of Doe's allegations regarding Elizalde. *Id.* ¶ 109. One week later, SBSO placed Elizalde on administrative leave. *Id.* ¶ 110. SBSO subsequently conducted criminal and administrative investigations into Doe's allegations. *Id.* ¶ 111. This included an investigation of Elizalde's patrol unit history. *Id.* ¶ 112. The Santa Barbara County District Attorney's Office declined to press charges against Elizalde. *Id.* ¶ 113. SBSO terminated Elizalde's employment as a result of the administrative investigation on November 30, 2023. *Id.* ¶ 114.

Prior to Doe's allegations on March 7, 2023, SBSO had no record of disciplinary history with Elizalde. *Id.* ¶ 115. Other than Doe's allegations of Elizalde committing sexual assault and

harassment, the County has no knowledge of other investigations or allegations of this kind against Elizalde. *Id.* ¶ 116.

## IV. Discussion

The County's Motion makes several arguments. As a threshold matter, it argues that Doe's pleadings insufficiently establish "duty to train" or "duty to supervise" *Monell* theories. On the merits, it argues that no genuine issues of material fact remain on Doe's three *Monell* theories: The duty to train, the duty to supervise, or the County's deliberately indifferent maintenance of a policy of information access.

This Court finds that the pleadings suffice to allow Doe to pursue duty to train or duty to supervise theories of liability under *Monell*. But, considering those three theories, this Court finds that the City has established that it is entitled to judgment on Doe's three theories of liability, all for similar reasons: Doe has not shown that the County's actions or nonactions were made with deliberate indifference to the County's inhabitants' constitutional rights. For these reasons, this Court GRANTS the Motion.

### A. Doe is not procedurally barred from pursuing *Monell* failure to train and failure to supervise theories.

The County first argues that this Court cannot consider *Monell* theories beyond Doe's deliberate indifference theory at this stage. This is because, in Doe's 1AC, she eliminated what were initially her second and third claims for relief in her initial complaint, which had alleged *Monell* liability on alternative theories. MPA at 27. The County's position is that, because Doe "eliminated her claim for relief alleging a failure to train theory . . . never asserted *Monell* liability against the County on a failure to supervise theory, and set forth no facts supporting such theories in her written discovery response," she should now be precluded from alleging those theories of liability. *Id.* In response, Doe argues that this argument has no merit. She notes that the 1AC *does* contain allegations supporting the theory that the County failed to train or supervise, "all of which are incorporated by reference into Plaintiff's *Monell* claim." *Id.* at 38 (citing 1AC ¶¶ 43-44, 52, 79, 106, 223-24, 226, 229, 236-37).

9

For two reasons, this Court finds that Doe may pursue her *Monell* claims premised on the County's failure to train and supervise.

First, Doe's pleadings were not required to be so specific that they detailed every possible theory of success on the *Monell* claim. The County notes that summary judgment is not intended as a "procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). But the County cites no more specific binding authority suggesting that a complaint must articulate every theory of *Monell* liability underlying a § 1983 claim in order for this Court to consider those theories at the summary judgment state.

Doe's citation to *Yee v. City of Escondido*, 503 U.S. 519 (1992), is instructive. There, the petitioners had raised a Takings Clause claim in their complaint. *Id.* at 534. The respondents argued that the petitioners only raised a *physical occupation* takings theory under the Takings Clause, not a theory about *regulatory* takings. *Id.* As such, the respondents reasoned, petitioners should be precluded from asserting it. The Court found that it was "unclear whether petitioners [had] made this argument below." *Id.* But, in any event, it found that "Petitioners' arguments that the ordinance constitutes a taking in two different ways . . . are not separate *claims*. They are, rather, separate *arguments* in support of a single claim—that the ordinance effects an unconstitutional taking." *Id.* at 534-35. Having properly raised a claim, "petitioners could have formulated any argument they liked in support of that claim." *Id.* at 535. Though the procedural posture of *Yee* differs from that of this case, *Yee* nonetheless stands for the proposition that a party need not elaborate every theory of success it intends to follow on the face of its complaint, so long as it properly raised the claim. This is consistent with the approach that other district courts facing the question have taken. *Mollica v. Cnty. of Sacramento*, 2023 WL 3481145, at *10 (E.D. Cal. May 16, 2023); *Quinto-Collins v. City of Antioch*, 2022 WL 18574, at *2 (N.D. Cal. Jan. 3, 2022).

Second, even if this Court found that Doe did need to elaborate each *Monell* theory she plans to pursue in her 1AC, it finds that Doe did so. Doe's 1AC does make allegations that support a failure to train theory. *See, e.g.*, 1AC ¶ 40-43 (alleging that the County "failed to properly train" Elizade on the vulnerability of domestic violence victims, contributing to Elizalde "us[ing] his position as a Sheriff's Deputy to gain Plaintiff's trust, and, subsequently, to sexually harass, assault,

and batter her"); *id.* ¶¶ 227, 229 (alleging the County "d[id] not train Sheriff Deputies on how to avoid violating Policy 1065.2(d)," which requires deputies to refrain from developing personal relationships with victims as a result of official contact)[5]. So too for a failure to supervise theory. *See, e.g.*, 1AC ¶ 224 (alleging the County "d[id] not properly supervise Sheriff Deputies' interactions with crime victims and/or members of the public to ensure they are free from sexual harassment and abuse"); *id.* ¶ 225–26 (alleging the County failed to supervise Elizalde as evidenced by their failure to detect his manipulation of his location tracking software, which prevented it from tracking his location when he met with Doe); *id.* ¶ 230 (alleging Defendants failed to follow up on misconduct allegations by requesting Doe to fill out a citizen complaint form).

In sum, this Court finds that Doe's 1AC is not deficient merely because it does not state every theory that could support the *Monell* claim. And, even if this were required, Doe has sufficiently done so here. For that reason, this Court will consider the parties' arguments on failure to train and failure to supervise.

**B. The third *Monell* element—deliberate indifference to constitutional rights**

The third *Monell* element requires Doe to demonstrate that the relevant County policy—or lack of policy—amounts to deliberate indifference to a constitutional right. *Gordon II*, 6 F.4th at 973. Doe posits three ways in which she seeks to prove her *Monell* claim: First, on the County's practice to allow access to sensitive information; second, on the County's failure to train; third, on the County's failure to supervise. For the following reasons, this Court finds that none of these policies or nonpolicies in this case, even drawing all reasonable inferences in Doe's favor, demonstrate the County's deliberate indifference to its inhabitants' constitutional rights. Because of this, this Court grants the Motion.

---

[5] The County itself acknowledges that, "[i]n her First Amended Complaint, Doe makes three references to a County failure to train." MPA at 29. This undercuts the County's suggestion that it was given insufficient notice that Doe would pursue such a theory. *Id.* at 28.

i. The County is entitled to summary judgment on the *Monell* theory regarding whether the County was deliberately indifferent in its custom or practice of allowing access to sensitive information.

The County moves for summary judgment on Doe's *Monell* claim to on the theory of the County's "custom or practice of allowing Sheriff's deputies to access information." MPA at 24. It argues that Doe lacks sufficient evidence to prove deliberate indifference. *Id.* In response, Doe argues that factual basis exists to find that the County had a custom or practice of allowing sheriff's deputies to improperly access private information. *Id.* at 36. For the reasons below, the County is entitled to summary judgment.

"Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *Canton*, 489 U.S. at 388. In other words, municipal liability under Section 1983 "attaches where—and only where—*a deliberate choice* to follow a course of action is made from among various alternatives by [municipality] policymakers." *Id.* at 389 (internal quotation marks omitted) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (plurality opinion)).

"A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). There are, however, three ways in which *Monell* liability may attach even to a single constitutional violation: (1) where the person who caused the constitutional violation was someone with "final policymaking authority," *id.* at 1235; (2) where a person with final policymaking authority "ratified" the constitutional violation committed by their subordinate, *id.* at 1238–40; and (3) where a person with final policymaking authority "acted with deliberate indifference to their subordinate's constitutional violations," *id.* at 1240; *see also Gillette v. Delmore*, 979 F.2d 1342, 1346–47.

The County argues that Doe cannot meet the high standard required to establish a practice or a custom. In its framing, "[l]acking evidence of widespread misuse of ARS or CLETS information by SBSO deputies causing constitutional violations, Doe is limited to the isolated facts of her case." MPA at 27. It reasons that, as this is an improper attempt to generalize Doe's individual experience

into a practice or custom, the evidence is insufficient to establish that officers' abilities to access others' cases constitutes deliberate indifference as to constitutional rights.

Doe, in opposition, notes that some record evidence exists from which a reasonable factfinder could see a generalized pattern—beyond the specifics of Doe's case—that SBSO officers would sometimes access cases that were not theirs. Doe's allegations on this matter are not limited to her own experience. She alleges, and offers evidence supporting the proposition that, "SBSO employees up and down the chain of command could—and did—regularly access any ARS report they pleased," regardless of the necessity for that access. SUF ¶ 165. She cites paragraph 165 of the Statement of Uncontroverted Facts, which in turn, cites three exhibits in support of the proposition. MPA at 30. The first is deposition excerpts from Jason Grossini, SBSO Commander. Dkt. No. 67-3 ("Barry Decl."), Ex. 30 ("Grossini Dep."). In his deposition, Grossini discusses possible instances in which an officer might inspect case files for cases that are not theirs—including in instances where an officer investigates conduct from a known person of interest, or as educational opportunities for trainees. *Id.* at 126:25-129:21, 135:5-18. The second is deposition excerpts from Seth Woodill, a sergeant with SBSO. Barry Decl., Ex. 36 ("Woodill Dep."). Woodill largely corroborates Grossini's characterization of a practice of allowing officers to look at case files beyond their own for investigative and other educational purposes. *Id.* at 179:7-181:16. The third is deposition excerpts from Elizalde. Barry Decl., Ex. 29 ("Elizalde Dep."). There, he expresses a belief that other sheriff deputies also look up cases to which they have no affiliation. *Id.* at 114:10-24. This evidence is not clear on whether this practice is improper; most of the record on sheriff staff accessing cases that are not theirs suggests a legitimate purpose, such as training or investigating leads in a case. This Court's role, however, is not to weigh the evidence at summary judgment, and Doe is entitled to reasonable inferences in her favor. Taking this in the light most favorable to Doe, then, some evidence supports a theory that there was some practice of accessing others' cases that extended beyond Doe's own treatment.

What this evidence does not do, however, is indicate that the practice was maintained with deliberate indifference to constitutional rights.[6] On this element of the *Monell* framework, Doe must establish at least a genuine dispute of material fact on that "the [County's] *policy* amounts to deliberate indifference to [a] constitutional right." *See Gordon II*, 6 F.4th at 973 (emphasis added). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a *known or obvious* consequence of his action." *Christie*, 176 F.3d at 1240 (internal quotation marks omitted). This is what can show that "the defendant 'was on actual or constructive notice that its omission would likely result in a constitutional violation.'" *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012). Only then does "omission become[] 'the functional equivalent of a decision by [the County] itself to violate the Constitution.'" *Tsao*, 698 F.3d at 1145 (quoting *Connick v. Thompson*, 563 U.S. 51, 72 (2011). As the Ninth Circuit has recognized, "federal constitutional law recognizes a 'right to informational privacy' stemming from 'the individual interest in avoiding disclosure of personal matters.'" *Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 768 (9th Cir. 2020). "Legitimate governmental interests combined with protections against public dissemination can foreclose a constitutional violation." *Id.* (citing *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 138 (2001)). But to meet the deliberate indifference standard, "a pattern of similar constitutional violations . . . is 'ordinarily necessary.'"[7] *Connick*, 563 U.S. at 63 (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997))).

---

[6] To be clear, the County's Motion does not contest—so this Court does not address—whether Elizalde was acting under color of state law and whether he sexually assaulted, harassed, and battered Doe in violation of *her own* Fourth and Fourteenth Amendment rights. MPA at 23 n.2.

[7] At the hearing, Doe argued that this is not required. But the authorities that Doe cited confirm, rather than defeat, this rule of law. *See Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021) (affirming summary judgment on *Monell* claim where because, "generally, a single instance of unlawful conduct is insufficient to state a claim for municipal liability under section 1983"); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) ("It is not sufficient for a plaintiff to identify a custom or policy, attributable to the municipality, that caused his injury. A plaintiff must also demonstrate that the *custom or policy was adhered to with "deliberate indifference to the constitutional rights* of [the jail's] inhabitants." (emphasis added) (internal quotation marks omitted)).

14

Doe has shown evidence supporting the inference that the practice of accessing sensitive information beyond an officer's own cases extended beyond her case, but not of an ensuing pattern of similar constitutional violations—or other conduct that should fairly have put the County on notice of that risk. *See Benavidez*, 993 F.3d at 1153-54. More specifically, it does not appear that the conduct perpetuated by the policy—here, the access that officers had to view other officers' case files—put the County on actual or constructive notice that the absence of a more rigorous policy would likely result in a *constitutional violation*. Doe's evidence generally indicates that officers access others' case files for legitimate purposes—for example, to see examples of reports, investigate new leads, or determine if known individuals were posing some danger to the community. *See, e.g.*, Grossini Dep. at 126:25-126:22 (discussing file access for the purpose of investigating cases or pursuing leads); Woodill Dep. at 179:7-181:16 (same); Elizalde Dep. at 115:3-10 (discussing file access for the purpose of investigating officer's current cases or calls). Indeed, the parties do not dispute that "[t]here are many reasons that an SBSO peace officer would use ARS to look up a report that was written by another deputy or another person." *Id.* ¶ 125.  In other words, Doe has not demonstrated that the conduct of viewing others' case files had been sufficiently wrongful to put the County on notice that constitutional violations were likely to ensue.

Nor has Doe offered evidence showing a policy of *dissemination* of case files. Binding authority on *Monell* claims in invasion of privacy cases repeatedly turn on whether sensitive information was made public—not just whether it was viewed. *See, e.g.*, *Endy*, 975 F.3d at 757; *Nelson*, 562 U.S. at 138. *Endy* is instructive on this point: There, the Ninth Circuit affirmed a grant of summary judgment for Los Angeles County on a *Monell* claim regarding the County's practice of keeping internal records of child abuse allegations made against Plaintiff—even after a court of law dismissed the allegations. *Endy*, 975 F.3d at 762. It reasoned that Endy had "not shown that the

---

Moreover, to the extent Doe suggests the single instance of misconduct she alleges could give rise to *Monell* liability, *Benavidez* forecloses that possibility. "Where, as here, the County employees are not making life-threatening decisions . . . and because micromanaging of municipal policies should be avoided, the single incident exception is inapplicable. 993 F.3d at 1154–55.

15

County publicly disseminates or misuses his information in a manner that would violate his constitutional right to privacy." *Id.* at 769–70.

Doe directs this Court to her expert's report, in which he opines that the "failure to enforce the access restrictions for ARS and CLETS is a pervasive organizational issue, indicative of a standard or practice, within the Santa Barbara County Sheriff's Office." SUF ¶ 279 (citing Dkt. No. 67-57 ("Pitoun Decl."), Ex. 295 ¶¶ 94–95). Even crediting this as true, this Court is not aware of record evidence that supports finding that the County was on actual or constructive notice that this would lead to constitutional violations, either due to a breach of privacy rights or due to other officers' wrongful use of sensitive information. At the hearing, Doe also noted that the expert report opines on the danger of misuse of sensitive data. Again, even crediting this as true, it does not necessarily follow that the County was on actual and constructive notice that officers' access to sensitive data would lead to constitutional violations—particularly given the lack of record evidence on a practice of misusing sensitive data.

Furthermore, even to the extent that viewing others' case files was for illegitimate purposes, Doe has merely asserted—and not shown in the record or in governing law—that the mere existence of a policy to protect the constitutional right to privacy means that every violation of that policy puts the municipality on notice of a constitutional violation. The fact that a policy is instituted to protect against a particular constitutional violation does not mean that every violation of that policy puts the municipality on "constructive notice" of constitutional violations such that it can be liable for deliberate indifference.

In sum, this record lacks evidence sufficient for a reasonable factfinder to find in Doe's favor that the County met the stringent standard of deliberate indifference. For that reason, on this theory, the County is entitled to summary judgment as a matter of law.

        ii. <u>The County is entitled to summary judgment on the Monell theory regarding whether the County was deliberately indifferent in its custom or practice of failing to supervise.</u>

The County next moves for summary judgment on whether Doe has established a triable issue of fact on a *Monell* theory premised on the failure to supervise. Doe advances two theories in

support of her failure to supervise claim. She alleges the County failed to supervise officers insofar as it (1) did not sufficiently monitor officers' location, and (2) did not sufficiently monitor officers' viewing of confidential reports. For the reasons below, this Court finds that Doe has not established evidence to support that either failure to supervise, even if true, was deliberately indifferent to constitutional protections. For that reason, it grants summary judgment.

When the need to supervise "was obvious and the failure to do so made a violation of constitutional rights likely," a failure to supervise is "sufficiently inadequate" to amount to "deliberate indifference." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (first quoting *Canton*, 489 U.S. at 390; and then quoting *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989)). "Mere negligence in training or supervision, however, does not give rise to a *Monell* claim." *Id.* (quoting *Davis*, 869 F.2d at 1235).

The parties agree on that, at least two times, Elizalde disconnected his MDC (thereby interrupting his supervisor's ability to see his location) for over an hour to see Doe. SUF ¶¶ 86, 96, 99. It is not clear that Elizalde's supervisor ever attempted to verify his location during these periods of disconnection, contact Elizalde to inquire as to the length of his inactivity, or follow up in any other manner regarding those seemingly unexplained periods of inactivity. But the parties dispute how unreasonable it was for SBSO to investigate Elizalde's losses of connection to the MDC and VisiNet systems. The County argues that "[i]t is not uncommon for a patrol unit to be in one place for an extended period of time." SUF ¶ 123. But, in opposition, Doe cites record evidence indicating that Elizalde's periods of disconnection would have, or should have, reasonably seemed unusual. She points this Court to evidence suggesting that a "normal break period" would have ranged from fifteen to thirty minutes. *Id*. She also offers expert testimony indicating that supervisors should reasonably notice officers' inactivity within thirty to forty-five minutes. *Id.*

Making reasonable inferences in Doe's favor, a reasonable factfinder could find that a failure to supervise occurred. But Doe has not shown that the failure to supervise officers' locations was such that the city should have known that, absent supervision, "a violation of constitutional rights" was "likely." *Dougherty*, 654 F.3d at 900. First, Doe has not demonstrated that the County was, or should have been, on notice that officers taking unusually long periods of inactivity were likely to be

violating others' constitutional rights. Doe has not shown, for example, prior instances of officers violating others' constitutional rights while disconnected and seemingly inactive on the MPC system. Nor is it otherwise reasonable to assume, on these facts, that the County could have foreseen the likelihood that an officer would violate others' constitutional rights while inactive on the MPC system. Doe does not direct this Court to any record evidence, and this Court has not independently identified any, that supports that it was a reasonable assumption that, if an officer was stationary for an hour or longer, he was likely to be violating another's constitutional rights.

Doe next claims that the County's failure to supervise officers' use of the case and report lookup systems was sufficient to create *Monell* liability. For the same reasons that this Court discussed above, *see supra* Section III.B.i, Doe has not created a genuine issue of material fact on whether the County's failure to set additional policies regarding officers' access to sensitive information was foreseeably likely to lead to constitutional violations. Doe has not offered evidence that prior access has been improper—though she cites to the record showing that several SBSO employees access others' case files, there is no evidence that it was done for a wrongful purpose prior to Elizalde. Indeed, as with *Endy*, the general practice of case access appears to be "limited to specific governmental entities for primarily investigative and case management purposes." 975 F.3d at 766. Nor does she offer evidence showing that constitutional violations would likely ensue from officers' access to case files, such that any wrongdoing on Elizalde's part is imputable to County policy.

Doe's other arguments in favor of failure to supervise liability also fail on this basis. Doe states that she "has evidence that SBSO does not audit its deputies' access to ARS; that known computer issues prevent sergeants from adequately supervising deputies in the field; and that SBSO failed to include standard video surveillance equipment in [its stations]." MPA at 42. This Court does find evidence in the record to support each of these propositions. But the same missing link— whether all of this amounts to deliberate indifference that made constitutional violations likely— prevents finding that these facts make out a plausible *Monell* claim.

In conclusion, Doe has shown evidence supporting the conclusion that Elizalde's behavior should have warranted follow-up from his supervisors. But this record does not show evidence that

18

that the County's inaction was with deliberate indifference to constitutional rights. Because of this, a reasonable factfinder could not find that the City's policy of inaction rose to the level of creating *Monell* liability. For that reason, on this theory, the County is entitled to summary judgment as a matter of law.

### iii. The County is entitled to summary judgment on the Monell theory regarding whether the County was deliberately indifferent in its custom or practice of failing to train.

The County next moves for summary judgment on whether Doe has established a triable issue of fact on a *Monell* theory based on the failure to train.

When a plaintiff alleges a municipality's "failure to provide training to municipal employees resulted in the constitutional deprivation she suffered," those claims "can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Canton*, 489 U.S. at 392. There must be reason to think the municipality was, or should have been, aware of the likely constitutional consequences of its policy. As the Ninth Circuit put it in *Long v. County of Los Angeles*:

> The continued adherence by policymakers to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability. Further, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the moving force behind the plaintiff's injury.

442 F.3d 1178, 1186 (9th Cir. 2006) (citations and internal quotation marks omitted).

The operative Complaint claims that the County (1) failed to train Elizalde on the special vulnerability of domestic violence victims, (2) failed to train SBSO deputies not to target crime victims and/or members of the public for sexual harassment and abuse, and (3) failed to train SBSO deputies on how to avoid violating a policy restricting SBSO deputies from developing personal relationships with individuals that they meet through official contact. 1AC ¶¶ 43, 223, 227, 229. But, in its opposition to the County's Motion, Doe appears to abandon these theories. She instead argues only that "Plaintiff alleges the County is liable under *Monell* because it failed to train SBSO deputies

19

on responsible use of information maintained within ARS and CLETS." MPA at 43. This theory does not appear to have basis in the operative Complaint—the 1AC does not appear to mention either the ARS or the CLETS system, and as discussed, it premises its failure to train theory on three other bases that Doe does not address in this Motion.

Summary judgment is not a "procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc.*, 435 F.3d at 992. The 1AC failed to put the County on notice that Doe intended to premise her case on faulty training on electronic records access—a theory of the case distinctly different from the 1AC's allegations of faulty training on maintaining professional relationships and treating crime victims with sensitivity and professionalism. For that reason, Doe's argument on failure to train on electronic information use is improper for the summary judgment stage.

In sum, for the reasons discussed above, Doe has wholly departed from the failure to train theory expressed in the 1AC. The Court grants summary judgment on this basis.

* * *

In sum, the Court has evaluated Doe's three proffered theories for establishing that one of the County's policies—or nonpolicies—was followed with "deliberate indifference to the rights of its inhabitants," such that that "shortcoming [can] be properly thought of as a city policy or custom that is actionable under § 1983." *Canton*, 489 U.S. at 389. "Mere negligence" does not suffice. *Id.* at 390. Because Doe has not offered sufficient facts supporting that the County's actions or omissions rise to the high level of deliberate indifference, this Court GRANTS the County's motion for partial summary judgment.

## C. The fourth *Monell* element—causation

As an alternative basis for summary judgment, the County argues that Doe has not created a genuine dispute of material fact on whether any alleged County policy or custom "was the moving force behind the deprivation of Plaintiff's constitutional rights." MPA at 32. Doe responds that she has created a triable issue of fact on causation. MPA at 45–48.

A municipality can face Section 1983 liability "only where its policies are the 'moving force [behind] the constitutional violation.'" *Canton*, 489 U.S. at 388 (citing *Monell*, 436 U.S. at 694, and *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)). A policy is a "moving force" when the "identified

deficiency" in the County's actions is "closely related to the ultimate injury." *Gibson v. Washoe*, 290 F.3d 1175, 1193–94 (9th Cir. 2002).

This Court has already explained its reasons for granting summary judgment on the deliberate indifference element. Therefore, it cannot and need not resolve whether one of those policies (or nonpolicies) was the moving force behind Doe's deprivation of constitutional rights.

### V.  Conclusion

For the foregoing reasons, the County's Motion is GRANTED. Doe's first cause of action is DISMISSED.

IT IS SO ORDERED.

Dated: February 13, 2026

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge